THOMAS F. HOPPIN et ux. v. THOMAS A. JENCKES.

The privilege from arrest of a member of Congress under the provisions of the Constitution, does not extend to forty days and more before and after a session, but is limited to a reasonable time for going and returning.

ASSUMPSIT upon the endorsement of certain promissory notes. The writ was served by the attachment of real estate. Plea of privilege of member of Congress, under Article I., Section 6 of the Constitution of the United States. Demurrer to the plea.

The question was argued by L. C. Ashley and A. Payne, Esqs. upon the following brief:—

The defendant's plea in abatement sets up two alleged points or grounds of defence against the service of the plaintiff's writ, viz. :

That defendant was a member of Congress, and had not forty days or a reasonable time more than that in which to return home after Congress adjourned on the 20th day of July, 1867, to meet on the —— day of November, 1867.

And that defendant was member of a committee of the House of Representatives, authorized to sit in the vacation, and was,

when said writ was served by attachment of property, engaged in duties put upon him by said committee, and which he avers entitles him to the same privilege as if said Congress were on that day in session.

I.   Plaintiffs demur, generally and specially.   The defendant's plea is double, and therefore bad.   1 Chitty on Pleading, § 226 (of Duplicity).   Defendant could have filed separate pleas upon each point if so disposed.   Rev. Statutes, chap. 185, p. 446.

II.   Plaintiffs must demur to whole plea and cannot demur to part and reply to residue.   1 Chitty on Pleading, 664.

III.   The defendant's plea does not state that he was in attendance upon Congress at any session thereof, and therefore sets up no legal defence in this particular.

IV.   The defendant's plea is ambiguous and doubtful, and therefore bad.   1 Chitty on Pleading, § 237.

V.   A member of Congress is not entitled to the exemption set up in the plea.   Nor is he exempt from writs of arrest, or from arrest thereon for forty days after adjournment, but only from such arrest for a convenient time to return home, and until he returns home.   1 Story on Constitution, § 862, &c. ; Jefferson's Manual, § 3 ;  Colvin v. Morgan, 1 Johnson's Cases, 416 ; Lewis v. Elmendorf, 2 Johnson's Cases, 222 ;  Chaffee v. Jones, 19 Pickering, 267 ;  Coffin v. Coffin, 4 Mass. 29 and 34 ; 2 Strange, 987 ; 1 Blackstone Com. 165, 166 and note, (Sharswood's Ed.)

VI.   According to the plea, the defendant had a month and three days in which to return home, which is a sufficiently convenient time and more, within which to return from Washington to Cumberland.

VII.   The defendant's plea does not allege that the defendant had not returned home, and is therefore bad.   Colvin v. Morgan, 1 Johnson's cases, 416, above cited.

VIII.   This plea of privilege is not to be favored, and a plea is always to be taken most strongly against party pleading.   1 Chitty on Pleading, 237.

IX.   That the defendant was performing duties under the direction of a committee of Congress is no ground of exemption

from arrest. If the committee had been in session, not sufficient; but they were not.

And by the defendant *pro se*, and *B. F. Thurston* and *L. Scott, Esqs.* upon the following briefs :—

1. The service of a writ of arrest upon a member of Congress during the period of his exemption from arrest, is equally null and void, whether said writ be served by arrest of the person or by the attachment of his property. *Knight & Co.* v. *Richmond & Carr*, 2 R. I. 75 ; *Waterman* v. *Isaac Merritt & Co.*, 2 R. I. 345 ; *Seaver* v. *Robinson*, 3 Duer, 622 ; *Sandford* v. *Chase*, 3 Cowen, 381 ; *Norris* v. *Beach*, 2 Johnson, 294 ; *Colton* v. *Martin*, 1 Dallas, 298 ; *Smythe* v. *Banks*, 4 Dallas, 329 ; *Miles* v. *McCulloch*, 1 Binney, 77 ; *Halsey* v. *Stewart*, 1 Southard, 366 ; Cushing on Legislative Assemblies, §§ 503 and 541 to 548 inclusive ; Constitution of Rhode Island, article IV., § 5.

II. No process of arrest can be issued against a member during the period for which his privilege lasts. Constitution United States, article I., § 6.

III. First.—That period is during a session, and for a convenient time, before and after the session. May on Law of Parliament, 120 ; *Gowdey* v. *Duncombe*, 1 Welsby, H. & G. 430 ; Report of the Judiciary Committee of the House of Representatives on Culver's case to the Thirty-Ninth Congress ; Cushing on Legislative Assemblies, § 582.

Second.—The language of the Constitution was taken from the rule of the British House of Commons, *eundo, morando et redeundo.* May, 120.

IV. The language should have the same construction here as in England.

V. In England the convenient time has been construed to be forty days at least. May, 120 ; *Gowdey* v. *Duncombe*, 1 Welsby, H. & G. 430.

VI. The reason for such construction is greater in this country than in England.

VII. But if not absolute for forty days, other circumstances may be alleged to show that the time is no more than reasonably convenient.

Allegations here are : First—That the defendant was charged with public employment growing out of his membership. Second—And, also, that, in matter of law, the adjournment was a recess.

VIII. Defendant's plea is not bad for duplicity. Defendant is not precluded from introducing several matters into his plea ; they are constituent parts of the same entire defence, and form one connected proposition, or if they are alleged as inducement to, or as a consequence of another fact. Sanders on Pleading and Evidence, Vol. 2, Part I. side page, 653 ; *Batts* v. *Purvis*, 2 Bla. 1022, 1028 ; *Robinson* v. *Bayley*, 1 Burr, 316, 318 ; *Carr* v. *Hinchliffe*, 4 B. & C. 547 ; *O'Brien* v. *Saxon*, 2 B. & C. 908 ; Com. Dig. Pleader, E. 2. 1 Ch. Pl. 558.

The opinion of the Court was given by BRADLEY, C. J.

This is an action against the defendant as endorser of certain promissory notes, in which he files a plea in abatement, setting forth in substance, that at the time of the service of the writ, to wit, on the 23d day of August, 1867, he was a member of the House of Representatives of the United States ; that Congress adjourned on the 20th day of July, 1867, to the 21st day of November, 1867 ; that he was a member of a joint committee of Congress authorized to sit during the adjournment, and actually engaged at the time of the service of the writ in duties assigned him by that committee.

After these allegations the plea avers : " And said writ was pretended to be served on said 23d day of August, 1867, and by said pretended attachment upon a writ of arrest, and not otherwise, and not at any other time, or in any other manner, and said 23d day of August was within the period of forty days, or such other convenient period of time more than forty days, within which said defendant was entitled to the privilege secured to members of Congress by the Constitution of the United States of America, by which they are protected from writs of arrest in going to and returning from the sessions of Congress, and while in attendance thereon."

The plea does not aver that the service was within a reasonably convenient time for returning, nor that it was during the

actual or constructive session of Congress. It raises the ques-
tion of law, whether the defendant is entitled to such period of
forty days, or more. When it further avers that he is entitled
to protection also as a member of the committee, it might be
considered as raising a double defence upon the same plea,
which, of course, is not permissible. Considering the plea, how-
ever, as raising the question of law which has been argued before
us, as to the right of exemption from arrest of members of Con-
gress, for the same period before and after a session which is
claimed to be covered by the privilege of members of Parlia-
ment, we will proceed to consider and decide that question.

A preliminary question, however, arises in the case, whether
the Constitutional provision which exempts the person, also ex-
empts the property of members of Congress from process. The
defendant has submitted some authorities in favor of the affirma-
tive of that proposition. The plaintiff's brief does not contro-
vert it. It is not necessary, therefore, for us very fully to con-
sider it. We may observe, however, in view of this privilege,
as it existed in the practice of Parliament, and in the law of
England prior to the adoption of our Constitution, that there is
much to favor the negative of the proposition. The House of
Commons ordered on the 14th of April, 1649, that in case of
any proceedings at law against any member, he shall receive
notice in writing of the pendency of the suit, whereupon, to
quote the language of the order, "the member is enjoined to
give appearance and proceed as other defendants in case of like .
suits or actions ought to do, or in default thereof, both their
estates and persons shall be liable to any proceedings in law or
equity as other members of the Commonwealth." House Jour-
nal of that date. The statutes 13th and 14th, William III.,
chapter 3, and still more, the statutes of 10th, George III., chap-
ter 50, give full authority ; the first with a limitation of four-
teen days after a dissolution or prorogation and to certain courts ;
the latter, without any such limitation of time or tribunal to the
prosecution of suits against members of Parliament, protecting
only the person from arrest or imprisonment from any such
suit or imprisonment, See May, 125–126.· Without de-

ciding that the privilege contained in the Constitution itself would give any protection to the property of members of Congress, we may rely for the purposes of this case upon the law of our State, which seems to be that when a writ of arrest cannot be issued against the person because of any privilege, his property cannot be attached upon original writ because of such privilege. The case of *Richmond & Carr* v. *Knight*, 2 R. I. Rep. 75, so decided, and this court, as at present constituted, has deemed it proper to accept the former decisions of the court, without considering the grounds of them, especially where those decisions were but the construction of the statutes of the State. With the frequent sessions of the General Assembly of so small a State, it is safe to presume that any mistake of the court would be corrected by subsequent legislation, and it is much better for the community that any changes of the law should be by statutes operating prospectively, rather than by decisions of the court operating retrospectively; and though this decision did not receive the concurrence of all the members of the court, we accept it as the law in this case. That decision, exempting from attachment the property of a voter during the time of his statute exemption from arrest, is closely analogous to the exemption claimed in the present instance, both being intended to protect a citizen while in the discharge of public trusts.

We come then to the inquiry, what is the extent of time covered by the privilege of exemption from arrest secured to members of Congress by the Constitution? The provision of the Constitution is in these terms, Art. I., Sec. 6: "The Senators and Representatives shall in all cases, except treason, felony, and breach of the peace, be privileged from arrest during their attendance at the sessions of their respective houses, and in going to and returning from the same." It is claimed that this privilege is an adoption into our Constitution of the corresponding privilege of members of Parliament. It is said to be the settled law of Parliament to allow forty days before and after such sessions of Parliament, in addition to the whole period of the session, as the time during which every member is

exempt from personal arrest. The plaintiff's brief has referred us to 1 Blackstone 165, in which this right of forty days exemption is stated to be by the law of England one of the privileges of a member of the House of Commons. Defendant's brief has referred us to May's Treatise upon Parliamentary law, page 118, which states that such is the general opinion, and also to the case of *Gowdey* v. *Duncombe*, 1 Welsby H. & G. 430 in which it is not only decided that such is the law of England, but it is said that " it has for about two centuries, at least, been considered the law of England." Brief refers us to the 2d of Strange, 985. The only case to which we have been referred in this country is a short *per curiam* opinion in the 2d of Johnson's Cases, 222, in which it does not appear how long after the session of Congress was the interval before the member's arrest, nor is any reference made by either court or counsel to anything but a single decision in the preceding volume upon a provision of the Constitution of New York. The report of the judiciary committee of the House of Representatives in Culver's case is claimed to have a conclusive force upon this question. It does not appear to have ever been formally adjudicated in our Courts, and as a question touching a provision of the Constitution of the United States, it deserves the most careful consideration. We are to determine the meaning of words used in the Constitution, not merely as they might be commonly accepted, but to inquire for their fixed legal signification at the time they were adopted as a part of that Constitution. The words by themselves certainly do not import nor in any way suggest that the member was to be allowed a period of forty days or more in going to or returning from a session of Congress. Before we can sustain the plea, we must be satisfied that the law of England, at the time of the adoption of the Constitution, gave this right to members of Parliament, and not only that this forty days was secured to them, but that it was secured as the convenient time for going to and returning from Parliament; and we must also be satisfied that such construction of the terms of the privilege was understood as the true construction, and as such adopted in the phrase which defines

this privilege in our Constitution. We will therefore endeavor to ascertain what was the law of England upon this subject as evinced either in the proceedings of Parliament or of the Courts, or in the compilations to which those who sought to know the law would have had recourse at and prior to the adoption of our Constitution. What the progress of opinion in regard to this privilege may afterwards have been in England, is of itself, of course, of no moment, though it may throw some light upon the inquiry in regard to what the law may have been at preceding periods in England. On the other hand, any opinions expressed in this country, especially near the time of the adoption of the Constitution, by judges and jurists, or by our statesmen, or any inferences that may properly be drawn, either from what they have said or what they have omitted to say, should be carefully considered, and would materially assist in determining the result of our inquiries.

To begin, then, at the earliest time when we can obtain any light upon this subject:

The ·earliest case to be found in the proceedings of Parliament touching the duration of time after the session of Parliament, for which the privilege of exemption from arrest was allowed, is Martin's case ¦in 1586, in the reign of Elizabeth. The report is found in Dewes' Journal, under the dates in which it occurred, the decision of the House being on page 414. It·is quoted quite fully in Hatsell's Precedents , page 99, as follows: " On the 27th of February, 1586, the House was informed that one William White had arrested Mr. Martin a member of the House, therefore it was ordered that the Sergeant should warn White to be here at to-morrow's sitting of the Court." On the 16th of March, William White was brought into the House to answer his contempt for arresting Mr. Martin, who answered " that he caused him to be˙ arrested the 22d day of January, which was above fourteen days before the beginning of the Parliament." The House upon this appoints a committee to search precedents, who on the 11th of March make report of the privilege of Mr. Martin arrested upon mesne process, by White, above twenty days before the beginning of this Parliament,

holden by prorogation, (mistaken for adjournment,) and in respect that the House was divided in opinion, Mr. Speaker, with the consent of the House, moved these questions to the House.

First—Whether they would limit a time certain or a reasonable time to any member of the House for his privilege? The House answered, a convenient time.

Second—Whether Mr. Martin was arrested within this reasonable time? ` The House answered, yes.

Third—If White should be punished for arresting Martin? The House answered, No—because the arrest was twenty days before the beginning of Parliament, and unknown to him that it would be taken for reasonable time. The report then goes on to give further reasons for the action of the House, among others, that this was the second time that White had arrested Martin. The House journal, under date of the 24th of April, 1640, gives an order of the House in regard to the arrest of a certain member in the following terms: "The contempt of his arrest to be declined, because it was not committed within the time of privilege, viz.: within sixteen days before the beginning of Parliament and so many after." It also reports under the same date as follows: "It was said this day in the House, and not contradicted, that every member of the House hath privilege for sixteen days exclusive and fifteen inclusive at the beginning and ending of every. Parliament." Ferrell's law of Parliament, published in 1837, page 277, says, in regard to the last citation, "the like mention is made in several parliaments by members in debate." This last writer upon the topic "for how long a time before and after the Parliament" this privilege exists, gives this last quotation from the debate in Parliament, and its statement as to other debates with a brief recital of Martin's case, as all that can be found upon this subject. Scobel's Journal, which we have not been able to find in any library to which we have had access, is quoted as citing on page 108 a similar order or the same order we have found in the House journal. We do not find in any treatise, opinion or discussion upon this subject any other citation of any order or action of the House of Commons touching this question of the duration of

privilege. Indeed, much that has been decided and written upon this subject, has been without any knowledge apparently of the orders, debates and actions to which we have referred. As we find no other citation to any action or order of Parliament in any work to which we have had access, in either the excellent library of Brown University, the library of Congress, the Astor Library, or the library of Boston, we feel warranted in assuming, what of course cannot be positively affirmed without a careful examination of every volume of the journal of the House of Commons, that they do not, by any action or order of that body, claim this privilege of forty days or more, before and after each session, as being the time allowed them for going to and returning from Parliament. We certainly can affirm that in a case which has been repeatedly quoted since, the House of Commons, after searching for precedents, declared that they claimed as distinct from any fixed time, only a convenient time, and subsequently announced as the order of the House upon the subject, a period of sixteen days, as the time of such privilege, and it is said that such claim has been frequently mentioned in debate without any contradiction.

We will now proceed to inquire what the courts have said and decided upon this question of the time of privilege. The first case is that of *Barnes* v. *Seigneur Ward*, Siderfin 29. It is the case of a peer of Parliament, and decided in the 12th of Charles II., 1660, in which it is decided that he is entitled to twenty days. " Et fuit dit que le privilege d'un member de Parliament desire vient lorsque 20 jours devant, et apres le Parliament come appient per le Parliament Ro. Come le Chief Justice dit comment que ils claime havet ceo, put 40 jours 'devant et appres que ils ne devoient avoir."

Second—The case of the *Earl of Athol* v. *the Earl of Derby*, in the 24th of Charles II., 1672, reported in the 2d of Levinz 721 ; also, in the 2d of Chancery Reports 221. This also was the case of a peer, and it cites two orders of the House of Lords in 1624 and 1628, claiming twenty days before and after each session, which the order says is time enough for them to come from all parts of the realm and return. Hereupon the Lord

Chancellor ordered the sequestration to be delivered and executed immediately after the twenty days, but it is said the Commons never assented to this, but claimed forty days after and before each session. The report in the 2d of Chancery is more full, and is as follows: " Whereupon a question arose what time or privilege a peer hath, viz.: whether twenty or ten days before and after session of Parliament. The Lord Keeper sent to Lord Hollis and others to advise in it, and they produced the orders in the House of Lords, whereby it appeared they declared their privilege to commence from the teste to the writ of summons for their first coming to Parliament. And that upon every session and prorogation, their privilege is for twenty days after such session. And it is said in the orders that it is sufficient time for them to come from all parts of the kingdom and to return, and they are in these orders desired to take notice of it and of the reason of it. These orders are the one of the 21st day of May, 1624, the other of the 27th of January, 1628, entered in the journal of the book of the Lord's House. But it is said the Commons never agreed thereto, and think themselves not bound by it, and sequestration was executed accordingly."

The third case is that to which counsel have referred, the second of Strange, 985, decided in 1734. The case seems to have attracted so much interest as to have been reported in no less than seven different reports—in Strange, 985; Hardwick, 29; 7 of Modern, 225; Fortescue, 159; 2d of Barnardiston, 424, 433, 448; in Cunningham, 16; and Comyn, 444. Colonel Pitt was arrested two days after the dissolution of Parliament. Strange says: "The Chief Justice declared that all the judges were of opinion Mr. Pitt was entitled to privilege redeundo for a convenient time, and that within that time he was arrested." Hardwick's Reports—" That it was not necessary in this case to determine to what time it was limited for supposing it to be only for a convenient time." A. d in Modern Reports it is said the judges declined to fix the time. The other reports are substantially the same, Barnardiston and Cunningham being the fullest. Comyn states the question and answer in this way. Second question—How long the privilege continued? It was

said the Lords have determined their privilege to have continuance for twenty days before the beginning, and twenty days after the ending of the session. But the Commons claim forty days— 2d of Levinz. " But the judges seemed to think that the Commons ought to have a reasonable time before and after the session, but what time was reasonable never had been by them expressly determined. Yet this arrest seemed too hasty within the time that ought to be allowed for his return." The next case is that of *Barnard* v. *Colonel Mordant*, 1 Kenyon, 125, decided in 1754. " The defendant, having been a member of the last Parliament, was arrested ten days after its dissolution" canvassing a re-election in the borough he represented. The foundation on which he contended for the continuance of the privilege, was that it subsisted such a reasonable time after the dissolution of a Parliament as might be supposed sufficient for the members to settle their affairs in town and return to their country seats. The defendant's seat was in Wiltshire, where, in fact, he had not been at the time of his arrest, and a case of the like nature was mentioned, Comyn, 444, where John Pitt, Esq., whose seat was for Camelford, being arrested two days after the dissolution of a former Parliament, the bail bond was ordered to be given up on a supposition of the continuance of his privilege. The Court in the present case leaned against the rule, but as it was not opposed they made it absolute for discharging the bail bond on entry of a common appearance.

These are all the cases to be found in the reports prior to the adoption of the Constitution. By them it appears that when this claim of forty days was first mentioned in Court, it was mentioned by the Chief Justice as a claim that ought not to be allowed. A few years after one reporter of a case (Levinz) observed that the Commons made such a claim. The other and fuller report says merely, " the Commons do not consider themselves bound by the orders of the House of Lords, which fixed twenty days for the privilege." And when we come to the case of Holliday & Pitt, so much considered by Lord Hardwick and the ten judges, chiefly, however, upon other points than this, we find the courts, though they do not refer to this action of the

House, which we have before quoted, seem to understand that there was no settled period, much less a period of forty days, and they considered that the Commons were entitled to a con- venient time, which would certainly cover the two days in ques- tion. And in 1754 the judges lean against an allowance of even ten days for the privilege, and allow it only because not opposed. Referring to the abridgments and digests of the law, we find in Bacon's Abridgment, (the first edition of which was published in 1736 to 1759, second in 1762, third in 1768, fourth in 1778 and fifth in 1798,) the law thus stated under the head of privi- lege 4. "As to the exact continuance of this privilege it seems in good measure unsettled to this day. It is indeed agreed in most books that members of Parliament have privilege *eundo, morando et redeundo*, and that they are entitled to privilege as well after a dissolution as a prorogation of the Parliament." "By two orders of the House of Lords, one dated the 28th day of May, 1624, the other the 27th of January, 1628, it is declared that the privilege commences from the teste of their writ of summons to Parliament, and that upon every session and proro- gation their privilege is for twenty days before and twenty days after each session, which, one of the orders says, is time enough for them to come from all parts of the realm and to return. But the Commons never assented to this, for they claim forty days before and after each session." It then cites Colonel Pitt's case, saying that the court did not think it necessary in the determi- nation of this cause to ascertain the exact time of privilege that members of Parliament were entitled to, after a dissolution of Parliament. Comyn's Digest, the first edition of which was published in 1762–67, says—Parliament D. 17: "The privilege of a peer commences from the teste of the summons and con- tinues for twenty days after the session, and so for twenty days before and twenty days after every session upon prorogation." R. by the Lords, 28th May, 1624, and 27th January, 1628; 2 Levinz, 721 ; Keble, 329. But the Commons claim forty days before and after every session. A subsequent editor, probably, inserts "On the dissolution of Parliament the members have privilege *redeundo* for a reasonable time." Pitt's case, 7 and 87 ;

Fort. 139; Str. 985; B., B. and H. 28. These writers, stating that the law is unsettled, that the period is a reasonable time, call the forty days merely a claim of the House of Commons. Blackstone is the first and only writer to pronounce it law. He says, I—165, probably the first edition, in 1765: "Privilege of exemption from arrest is in a commoner by the privilege of Parliament for forty days after every prorogation and for forty days before the next appointed meeting," for which he cites only the second of Levinz, 72. Hatzell's Precedents, the first volume of which is a collection and discussion of cases of privilege, published in 1776, repeatedly states (as see the citations in its index and elsewhere) that the duration of privilege is uncertain. From the state of the law, as found in the journals and resolutions of the two houses, and in the decisions of the courts, and in those abridgments and digests which have always been considered its trustworthy expositors, and from the conclusions stated and verified in the chief, if not the only work, on the subject of privilege at the time of the adoption of our Constitution, notwithstanding the remark of Blackstone, which illustrates, by examining his citations, the inaccuracy which others have observed in the legal statements of this elegant commentator.

From this review of the law and its literature, as it stood at the time of the adoption of the Constitution, we certainly cannot say that the language used in the Constitution had such a fixed and well known legal meaning that those who adopted the Constitution must have been supposed to know that the phrase "during their attendance upon the session of their respective houses, and in going to and returning from the same," included a period of not less than forty days before and after each session. Had the case of *Barnes* v. *Ward*, or either of the seven reports of *Holliday* v. *Pitt*, or *Barnard* v. *Mordant*, or the action of the House of Commons in 1586 and in 1640, to which we have referred, or even the report of the Chancery cases of the Earl of Athol against the Earl of Derby, been before the only writer previous to 1786, who stated that forty days was the right of a commoner, he would not, upon a reporter's observation of a

point not under judicial inquiry, have stated that such was the law. But upon his statement, the opinion of the large number of intelligent men, whose knowledge upon questions of law is not more exact or profound than can be acquired in the pages of Blackstone, would be sufficient, coupled with the constantly growing power of the House of Commons, to have created that general belief, of which May speaks in the page and volume to which we have been referred. And, indeed, in the first edition of his work, published in 1844, May says upon this very subject, that the precedents by no means establish this extent of privilege to be either the law or the practice, and leaves the matter altogether in doubt. We are, therefore, brought upon this declaration of Mr. May to the case of *Gowdey* v. *Duncombe*, 1 W. H. & G. 430, decided in the Court of Exchequer in 1847, as the first case in which, even in England, this right to forty days is declared to be law. That learned court asserts : "We think that the conclusion to be drawn from all that is to be found in the books, is this—that whether the rule was originally for a convenient time or for a time certain, the period of forty days before and after the meeting of Parliament has, for about two centuries at least, been considered either a convenient time or the actual time to be allowed. Such has been the usage, the universally prevailing opinion on the subject, and such, we think, is law." The assertion that from the books it appears that such has been the law for two centuries at least, must be considered as made in regard to the books before them, which appear either in the opinion of the court, or in the argument of counsel, and not in regard to the books not before them. The books not before them are the House journals of 1640, to which we have referred, stating the time to be sixteen days, the case in Siderfin, 1660, which holds that forty days were not to be allowed, none of the seven reports of Holliday and Pitt, nor the case of Barnard and Mordant. They have before them and rely upon Blackstone's Com., the case of *Athol* v. *Derby*, and Levinz, (as cited by Blackstone.) They say that in Bacon's Abridgment the authorities are collected. They mention an Irish statute, which limits the time to forty days, and an Eng-

lish statute, which does not mention the duration of the privilege. They speak, also, of the franking privilege as limited by statute to forty days. They refer to the case cited from Dewes' Journal, as given at large in Bacon's Abridgment, and as having some tendency to support the view, that the rule was for a convenient period. They refer, also, to Jenkin's book of centuries, which we have not been able to find, as stating the privilege to be forty days. But that statement, compared with the year book, to which it refers, will be found to have been made with less reason than Blackstone's statements. This is all upon which that court must be deemed to have founded the opinion as to the law for two hundred years in England. Prynne, in his Brief animadversions, speaking of the Irish statute quoted by the court, says: "The Irish Parliament allowed forty days because of the danger by Irish rebels." Prynne's 4 Reg. 1216, is quoted as denying the right, but we have not been able to test the citation. If the proceedings in the House of Commons and in the courts, which we have cited at length, and which were not called to their attention, had been before the court in Duncombe's case, they could not have made that declaration as to the history of the law for two hundred years, as found in the books. While we accept the decision as conclusive evidence of the law of England to-day, we cannot, for the reasons given in this opinion, accept it as conclusive evidence of what the law has been in England for more than two centuries, or that such was the law of England at the time of the adoption of the Constitution of our own country.

From this examination of the proceedings of Parliament, of the decisions of the courts, and of the law writers of England, we feel justified in saying that there is a weight of authority sufficient to overbalance the observation of Blackstone or even that of the Court of Exchequer in Duncombe's case, and sufficient to justify us in saying that the law in England at that time upon the subject of the duration of privilege of members of Parliament was, that it was for a reasonable or a convenient time, and not for a period of forty days and more, as claimed by the defendant.

We now turn to another aspect of this subject, of more importance than the one which we have considered, and that is the inquiry, how this matter was understood and considered in this country at and subsequent to the time of the adoption of the Constitution, so far as can be learned from the language of our own writers, the decisions of our own courts and the action of the Houses of Congress? And upon this subject the defendant presents us with a report of the judiciary committee of the House in the case of Culver, at the session of the Thirty-ninth Congress, which report, he says, was unanimously adopted by that body.

That report, after quoting the provision of the Constitution under consideration, says: "This privilege, which is borrowed from the law and custom of Parliament, is of such high antiquity in England as to be absolutely lost in the night of time, and to stand, therefore, rather upon prescription as claimed by the Commons in the 17th of Edward IV. than on any positive law, although recognized in statutes as old as Ethelbert, Edward the Confessor, and Canute." We have nowhere else found any reference to the existence of any such statutes. Canute died in 1035, just two hundred years before the oldest statute now extant, that of Merton 20th, Henry III., 1235. Nor do we suppose that from any such statutes, so long preceding the Norman conquest, much real light could be obtained as to the privilege of members of Congress in our day. The report further states, that "Parliament is the sole judge as well as the zealous guardian of its laws, customs and privileges." We are aware that many judges, especially in the earlier times, near the period of the English revolution, have thus expressed themselves, but we understand that with the growth of the English Constitution, this claim has been overshadowed, if not extinguished. The countless forms in which the so called privilege was exercised in the time of the Long Parliament, and those which immediately preceded it, have diminished to the few and simple claims of freedom from arrest or summons and freedom of speech, and even these have been limited and controlled by statute, as we have seen, among other instances, in the 12th of William III.,

chapter 3, and the 10th of George III., chapter 50. And the struggle within our own time between the Courts and the House of Commons, as to the privilege claimed for the publication of their proceedings, must be fresh in the memory of all. The Courts held, by the judgment of Chief Justice Denman and his associates, that such publication was not privileged in an action for libel. The House of Commons asserted, by Journal resolutions, the doctrine that their publications were privileged, but though they had directed their publisher to appear and plead before this court, they did not carry up the case from the unanimous judgment of the four judges of the Queen's Bench to the ten judges in bank or the House of Lords. For a time the officers of the law were subjected to directly opposite commands from the House of Commons and from the courts; and many actions were " most unreasonably brought," as observed by Lord Denman himself, in which juries, whose English hearts burned within them, (again to quote his words) by their verdicts sustained the courts. But finally, with a wisdom characteristic of constitutional government, an act was passed which defined the rights at law in regard to such publications. These and other instances show that privilege, like prerogative, however haughty and self-asserting at times, has with increasing frequency bowed to the yoke of the law. The report further observes " that in regard to the time allowed for going and returning, although it has generally been considered to extend to forty days in either case, they (Parliament) have refused to determine any more than that it shall be a convenient one." How correct this statement may be, we have already considered. The report proceeds : " There is no question here, however, as to the duration of privilege," so that at all events, Culver's case does not turn upon the question of time, which we are now considering. Nor must we necessarily understand by the language of the report, which we have quoted, that they claim the same rights for either House of Congress as are attributed to Parliament. If it is however to be considered, as claimed by the defendant, as an emphatic and weighty declaration by the House of Representatives of its opinion upon this subject of privilege, it be-

comes us carefully to consider whether those opinions have any better foundation in American law than that which they have for their statements as to the law of England. It appears, then, in the first instance, that in the convention which adopted the Constitution, there was no debate upon this provision. Neither in the Federalist, nor in any other discussion to which we have had access, is any mention made of any such supposed duration of privilege as is now claimed to have been generally considered at least to have been legally implied in the terms of this clause of the Constitution. It is hardly possible, that in a body so jealous of privilege as the convention that formed the Constitution, or in those State conventions, still more jealous, which discussed its adoption or rejection, or among the lawyers and statesmen who counselled the people at this critical hour of our history, it certainly is not possible, if such had been generally considered to be the duration of a member's privilege, that it should thus have entirely escaped observation. Among the commentators upon American law, Chancellor Kent makes no observation upon this subject—he merely repeats that provision of the Constitution in its terms. The learning of Judge Story in the history and law of England seems to have been present to his mind, when, in his work on the Constitution, section 862, he used the following remarkable language: " It is also confined in all cases to a reasonable time, *eundo, morando et redeundo*, instead of being limited to a precise number of days. It was probably from a survey of the abuses of privilege, which for a long time defeated in England the purposes of justice, that the Constitution has thus marked this boundary with a sedulous caution. From the acquaintance of Judge Story with American constitutional law, and his copious style of discussion, he would not have failed to remark upon the claim now made, had any such been called to his attention, either in his reading or personal acquaintance with the eminent men who constructed or expounded that Constitution. There are some early cases in the courts in this country from which the same inferences may be drawn. One already mentioned is *Lewis* v. *Elmendorf*, 2d Johnson's Cases, 222—1801. The court, of which Kent was a

member, says: "this privilege is to be taken strictly, and is to be allowed only while the party is attending Congress or is actually on his journey going or returning from the seat of government." The claim of the defendant was that he was to be allowed twenty miles a day for travelling. In *Cox and Mc-Clenachen* v. *Houston*, 2 Dallas, 478, decided in 1788, the defendant, a member of Congress, having claimed his privilege to be discharged, the parties agreed that he should be surrendered within four days after the session of Congress, " and the court declared their approbation of the compromise as affording a good precedent for future cases of the same kind." In the case of *Bolton* v. *Martin*, 1st Dallas, decided in 1778, the court, speaking of the right of members of Parliament, say "during the recess within the time of privilege, which was a reasonable time *eundo et redeundo*;" and they also inferred it was clear, from certain statutes of Pennsylvania, that its legislature so understood the privilege of Parliament. These are all the references and decisions of the courts in this country to which we have been referred by the diligence of counsel, or have found ourselves. Of the recent text-books in this country, we will first quote from Cushing's Law and Practice of Legislative Assemblies. This author, after reciting the privilege of Parliament as being forty days, says, (section 582): "In the Federal Government and in many States, members are privileged whilst going and returning, merely, without other limitation of time. Where the duration of the privilege is thus stated, members are entitled to a reasonable, or, as it was expressed by the House of Commons on occasion, a *convenient* time for going and returning. Thus they are not obliged at the close of the session to set out immediately on their return home, but may take a reasonable time to settle their private affairs and prepare for the journey; nor will the privilege be forfeited by reason of some slight deviation from the most direct road." The manual of parliamentary practice published by authority of the House of Representatives in 1860, states the rule as follows, (page 54): "The time necessary for going to and returning from Congress not being defined, it will, of course, be judged of in every particular case by those who

will have to decide the case. While privilege was understood in England to extend, as it does here, only to exemption from arrest, *eundo morando et redeundo*, the House of Commons themselves decided that a convenient time was to be understood. (1580) 1 Hats. 99–100. Nor is the law so strict in point of time as to require the party to set out immediately on his return, but allows him time to settle his private affairs and to prepare for his journey, and does not even scan his road very nicely, nor forfeit his protection for a little deviation from that which is most direct, some necessity perhaps constraining him to it. 2 Str. 986–987."

We ought to interpret the report in Culver's case in accordance with these rules, if such construction be possible, so long as the rule is not rescinded. The distinction between the powers of Parliament and those of Congress, under the Constitution, are so marked that they do not require comment. Nor can we presume that either House of Congress would overlook that distinction upon this subject. Notwithstanding, therefore, the inference drawn by the defendant from the language of the report in Culver's case, we hold it to be clear that the construction in this country of this clause of the Constitution at the time of its adoption, and since, has been inconsistent with the idea that the duration of this privilege was for a period of forty days before and after each session.

We have discussed, it may seem, at unnecessary length, the question presented by this plea ; but it called for a consideration of the law of England as to the duration of the privilege from arrest of a member of Parliament, and also the consideration of a clause of the Constitution of our country adopted from the parliamentary law of England. It is not enough in such cases to be content with what may be termed a common sense interpretation, or with a mere dissent from the opinions expressed or implied of such high authority as have been quoted to us. A court must satisfy itself by deeper and more thorough inquiries whether the obvious interpretation, or the one suggested by such learned minds is the true one. Any question which concerns the real spirit and exact meaning of any clause

of the Constitution of our country is to be approached by a court with a reverent spirit, which will think no labor unnecessary that tends to make clear the rights or the obligations declared in the great charter of the Republic.

Our conclusion, therefore, is to overrule the plea, as founded upon the supposition that the duration of privilege from arrest was forty days or more before and after each session of Congress; because the duration of this privilege, as defined in the Constitution, is understood by this court to be limited to a reasonable and convenient time, in addition to the actual session of Congress, for each member to go to and return from such session.